*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

A FELON'S CRUSADE FOR EQUALITY, HONESTY, AND TRUTH,

Plaintiff-Appellant,

v

DETROIT PUBLIC SCHOOLS COMMUNITY DISTRICT BOARD OF EDUCATION and SUPERINTENDENT SEARCH COMMITTEE OF THE BOARD OF EDUCATION,

Defendants-Appellees.

UNPUBLISHED
November 14, 2019

No. 343881
Wayne Circuit Court
LC No. 17-004919-CZ

Before: M. J. KELLY, P.J., and FORT HOOD and SWARTZLE, JJ.

PER CURIAM.

In this action involving claims under the Open Meetings Act (OMA), MCL 15.261 *et seq*., plaintiff, A Felon's Crusade for Equality, Honesty, and Truth, appeals as of right the trial court's order granting summary disposition in favor of defendants, Detroit Public Schools Community District Board of Education (the Board) and Superintendent Search Committee of the Board of Education (the Committee). We affirm.

## I. BACKGROUND

This matter arises from the Board's search for a superintendent for the then-newly created Detroit Public Schools Community District (DPSCD) in early 2017. In December 2016, DPSCD issued a request for proposals seeking bids from search firms that could assist in recruiting a qualified candidate. On January 5, 2017, three members of the Board—member Deborah Hunter-Harvill, member LaMar Lemmons,[1] and president Iris Taylor—were assigned to

---

[1] Although Georgia Lemmons was also a member of the Board during the time frame relevant to this appeal, our use of the name "Lemmons" throughout this opinion refers to LaMar Lemmons.

the Committee to review organizations that had responded to the request for proposals and report back to the Board. At an open meeting held January 11, 2017, the Committee recommended that Ray and Associates, Inc. (Ray), serve as the Board's search firm based upon Ray's experience, documented success rates, resources, and vetting policy. The Board accepted the recommendation without objection and entered into a contract with Ray shortly thereafter.

Ray screened materials from 75 prospective applicants and determined that only 10 applicants met the eligibility criteria established by the Board, "including experience, education, previous employment, and prior career positions held." At a special meeting on March 16, 2017, the Board voted to enter a closed session pursuant to MCL 15.268(f)[2] to review the application materials compiled by Ray. Before entering the closed session, the Board's vice president, Angelique Peterson-Mayberry, clarified that the Board would review the application materials in the closed session without directly engaging the applicants.

The Board members who were deposed during this case agreed that the Board reviewed applicants' résumés and a short video clip of each candidate responding to questions posed by Ray. After reviewing the qualifying applicants' materials, the Board members anonymously ranked the applicants and submitted their rankings to representatives of Ray, who then tallied and reported the results. By using the anonymous ranking system, the Board learned of each applicant's general standing, without having to engage in deliberations and without knowing any individual Board member's preferences. Peterson-Mayberry, Taylor, Lemmons, and Hunter-Harvill all agreed that there were no deliberations or decisions made during the closed session.

When the Board returned to the open session, they discussed the merits of the applicants, referring to each applicant by number so as to protect their anonymity. Based upon a suggestion from Ray, the Board voted to limit the applicants who would be considered final candidates to three. After further discussion, the Board eventually selected three final candidates, still identified only by number, and indicated that the candidates' names would be released to the public within 24 hours, after each candidate had been notified. Ultimately, one of the candidates withdrew from the application process, leaving the final two candidates, who were later identified as Nikolai Vitti and Derrick Coleman.

Between March 16, 2017, and April 18, 2017, Vitti and Coleman were further vetted. As part of this process, Peterson-Mayberry, Lemmons, and Hunter-Harvill attended site visits to the respective districts in which the final candidates were already employed. A representative of Wayne Regional Educational Service Agency (Wayne RESA) also attended the site visits. During the visits, the Board members collected data by touring several schools; talking to constituents, community stakeholders, students, and school personnel; and observing how the final candidates conducted business in their respective districts. At a special meeting on April 18, 2017, the Board considered the final candidates' qualifications, focusing its discussion

---

[2] MCL 15.268(f) authorizes a public body to meet in a closed session "[t]o review and consider the contents of an application for employment or appointment to a public office if the candidate requests that the application remain confidential." According to Ray, every applicant requested confidentiality throughout the screening process.

on the candidates' interviews, "Constituents Questionnaire Results," "Homework Assignment,"[3] and the site visits. At the conclusion of is deliberations on this issue, the Board voted to offer the superintendent position to Vitti.

Plaintiff initiated this action against defendants, alleging that they engaged in a number of OMA violations throughout the search for a superintendent. In particular, plaintiff alleged that the Committee violated the OMA by failing to post notices of its meetings, failing to hold the meetings in public, failing to maintain minutes, and privately deciding which search firm would be employed. With respect to the Board, plaintiff alleged that it violated the OMA by rubber-stamping the Committee's recommendation of Ray, deciding several matters in private before affirming them at the March 16, 2017 meeting, and privately selecting Vitti as the superintendent after improperly engaging in a private interview during the site visit. The trial court granted summary disposition in favor of defendants, and this appeal followed.

## II. STANDARDS OF REVIEW

This Court reviews de novo the trial court's ruling on a motion for summary disposition. *Galea v FCA US LLC*, 323 Mich App 360, 368; 917 NW2d 694 (2018). Defendants moved for summary disposition under MCR 2.116(C)(10), "which tests the factual sufficiency of the complaint." *Kelsey v Lint*, 322 Mich App 364, 370; 912 NW2d 862 (2017) (quotation marks and citation omitted). "When deciding a motion for summary disposition under this rule, a court must consider in the light most favorable to the nonmoving party the pleadings, affidavits, depositions, admissions, and other documentary evidence then filed in the action or submitted by the parties." *Campbell v Kovich*, 273 Mich App 227, 229; 731 NW2d 112 (2006). "Summary disposition is appropriate under MCR 2.116(C)(10) if there is no genuine issue regarding any material fact and the moving party is entitled to judgment as a matter of law." *West v Gen Motors Corp*, 469 Mich 177, 183; 665 NW2d 468 (2003). "A genuine issue of material fact exists when the record, giving the benefit of reasonable doubt to the opposing party, leaves open an issue upon which reasonable minds might differ." *Id*. Where no genuine issue of material fact exists, the trial court may grant summary disposition in favor of the opposing party under MCR 2.116(I)(2) if the evidence demonstrates that the opposing party, rather than the moving party, is entitled to judgment as a matter of law. *Lockwood v Ellington Twp*, 323 Mich App 392, 401; 917 NW2d 413 (2018).

This Court also reviews de novo matters of statutory interpretation. *Driver v Naini*, 490 Mich 239, 246; 802 NW2d 311 (2011). In considering issues involving statutory interpretation, the primary goal of the reviewing court is to determine the legislative intent, as discerned from the plain language of the statute. *Petipren v Jaskowski*, 494 Mich 190, 201; 833 NW2d 247 (2013). "If the language is clear and unambiguous, the statute must be enforced as written without judicial construction." *Id*. at 201-202.

---

[3] We presume that the "Homework Assignment" noted in the April 18, 2017 minutes refers to three questions posed to the final candidates by the Board at the final interviews, which each candidate was asked to respond to within 24 hours.

## III. DISCUSSION

On appeal, plaintiff first challenges the trial court's determination that the Committee was exempt from compliance with the OMA. According to plaintiff, the trial court erred by finding that the Committee was not a public body for purposes of the OMA. We disagree.

As a general rule, under § 3 of the OMA, all "meetings of a public body," "decisions of a public body," and "deliberations of a public body constituting a quorum of its members" must take place in meetings open to the public. MCL 15.263(1) through (3); *Herald Co v Bay City*, 463 Mich 111, 128; 614 NW2d 873 (2000). Because the restrictions in the OMA apply only to public bodies, whether an entity is a public body is a threshold question in application of the OMA. *Herald Co*, 463 Mich at 129. In relevant part, the OMA defines a "public body" as

> any state or local legislative or governing body, including a board, commission, committee, subcommittee, authority, or council, that is empowered by state constitution, statute, charter, ordinance, resolution, or rule to exercise governmental or proprietary authority or perform a governmental or proprietary function . . . . [MCL 15.262(a).]

The Supreme Court has found that this definition encompasses two requirements. *Herald Co*, 463 Mich at 129. "First, the entity at issue must be a 'state or local legislative or governing body, including a board, commission, committee, subcommittee, authority, or council.' " *Id*., quoting MCL 15.262(a). MCL 380.381(4) provides that a community school district like DPSCD is "governed by" its school board. Thus, as a committee of a local governing body, the Committee meets the first requirement set forth in *Herald Co*. The second requirement for an entity to be deemed a public body is that the entity "must be 'empowered . . . to exercise governmental or proprietary authority or perform a governmental or proprietary function,' and that power must derive from 'state constitution, statute, charter, ordinance, resolution, or rule . . . .' " *Herald Co*, 463 Mich at 129, quoting MCL 15.262(a). It is this second requirement that is in dispute.

In *Booth Newspapers, Inc v Univ of Mich Bd of Regents*, 444 Mich 211, 215; 507 NW2d 422 (1993), the university's board of regents appointed itself as the committee responsible for choosing a new president for the university, appointed a single regent as chair, and formed several subcommittees to assist in the selection process. The chair was given sole authority to make the "first cut," and narrowed the pool of candidates from 250 to 70 after discussing the matter with the advisory committees and "informal subquorum groups of regents." *Id*. at 216. The acknowledged purpose of the chair's methods was "to achieve the same intercommunication that could have been achieved in a full board meeting." *Id*. The chair, other regents, and committees continued to narrow the list of candidates through closed meetings and informal discussions until a single candidate was left. *Id*. at 216-219. The last candidate was interviewed in an open session and, after the matter was discussed further in closed session, the last candidate was publically nominated and elected by the board of regents. *Id*. at 219-220. Our Supreme Court concluded that the chair and various committees were acting as public bodies under the OMA because they exercised expansive authority over the selection of the university's president, which was one of the most important exercises of governmental authority held by the board of regents. *Id*. at 225-226.

In contrast, in *Davis v Detroit Fin Review Team*, 296 Mich App 568; 821 NW2d 896 (2012), this Court considered *inter alia* whether a financial review team (FRT) appointed by the Governor was a governing body subject to the requirements of the OMA. The FRT had five primary authorities or functions provided by statute: it examined the books and records of local governments; it could use the services of state agencies and employees to carry out its tasks; it could negotiate and sign a consent agreement with the chief administrator of a local government and present the agreement to the local governing body and state financial authority for approval; it met with local governments to receive, discuss, and consider information concerning the locality's financial condition; and it reported its findings to the Governor and state financial authority. *Id*. at 601-608. After examining these functions, this Court concluded that the FRT was not empowered to "independently govern through decision-making that effectuates or formulates public policy," because its activities were primarily investigative and, despite its authority to make recommendations, it had no power to act upon those recommendations. *Id*. at 608-609. The Court also determined that the FRT could not be considered a public body under the delegated authority theory addressed in *Booth* because the team was appointed by the Governor, rather than a public body subject to the OMA. *Id*. at 609-611.

In this case, the Committee's activities were investigative. The Committee was tasked with interviewing organizations that had responded to DPSCD's request for proposals and reporting its findings back to the Board, as well as recommending a search firm that should be employed. As explained in *Davis*, a "report, even if it contains recommendations in addition to 'findings,' is purely advisory in nature and cannot constitute 'governing' through independent decision-making that effectuates or formulates public policy." *Id*. at 607-608. Furthermore, while the Committee derived its authority from a public body, i.e., the Board, its activities were a far cry from the nearly unfettered authority held by the chair and committees in *Booth*. As plaintiff's counsel conceded at oral argument, the Committee screened three search firm candidates and presented all three candidates for the Board's consideration at the January 11, 2017 open meeting. Thus, unlike the evasive procedures used in *Booth*, 444 Mich at 215-220, the Board was free to consider the merits of all three prospective search firms at a meeting open to the public. The mere fact that the Committee recommended Ray as the most qualified search firm does not necessitate the conclusion that the Committee was exercising the Board's authority to choose the search firm. See *Davis*, 296 Mich App at 600 ("We observe that rarely do recommendations coming from a public body originate from the entire public body itself."). The Committee explained the reasons for its recommendation and the Board was free to accept or reject that recommendation. Because the Committee only gathered and presented information to the Board, and because the Committee had no authority to act on its own recommendation, the trial court did not err by concluding that the Committee was not a public body required to comply with OMA.

Plaintiff also argues that the Committee should be considered a public body because its bylaws state that "[a]ll committees shall comply with the Open Meetings Act in accordance with the applicable laws and the Boards' bylaws." Plaintiff's position lacks merit because the scope of the term "public body" for purposes of the OMA is a matter of statutory construction. See *Herald Co*, 463 Mich at 128-130; *Schmiedicke v Clare Sch Bd*, 228 Mich App 259, 261; 577 NW2d 706 (1998), abrogated in part on other grounds by *Speicher v Columbia Twp Bd of Trustees*, 497 Mich 125 (2014). Thus, it is the Legislature's intent, and not the intent of those governed by the statutory enactment, that is controlling. See *Petipren*, 494 Mich at 201-202.

Moreover, even if the Board's bylaws had controlling effect on these issues, the bylaws require committees of the Board to comply with the OMA "in accordance with the applicable laws." Because the Committee was not a public body exercising a governmental function, the "applicable laws" did not require the Committee to conduct its activities in compliance with the OMA. *Herald Co*, 463 Mich at 129 ("The threshold issue under the OMA is whether an entity is a 'public body.' "). Thus, we find no error in the trial court's grant of summary disposition as to all claims stemming from the Committee's actions.

Next, plaintiff challenges the trial court's rulings concerning the Board's activities, arguing that the overwhelming evidence demonstrated that plaintiff was entitled to judgment as a matter of law. We disagree.

In its amended complaint, plaintiff challenged the Board's approval of the Committee's recommendation of Ray, alleging that the Board's rubber-stamping of the Committee's choice was improper. "The primary purpose of the OMA is to ensure that public entities conduct all their decision-making activities in open meetings and not simply hold open meetings where they rubber-stamp decisions that were previously made behind closed doors." *Schmiedicke*, 228 Mich App at 264. In *Schmiedicke*, the defendant school board asked its personnel and policy committee (PPC) to review the district's method of evaluating school administrators and consider whether the length of administrator contracts should be adjusted. *Id*. at 260-261. In a closed meeting, the PPC reached a recommendation to leave the district's existing policies in place. *Id*. at 261. When the PPC presented its recommendation to the school board at an open meeting, the school board took no action, "apparently because the PPC did not recommend any changes." *Id*. This Court found that the board delegated its authority to decide an issue that affected public policy because its failure to vote had the effect of passively affirming the PPC's recommendation. *Id*. at 263-264. It reasoned as follows:

> Here, defendant school board's referral to the PPC for a recommendation was a delegation of authority to perform a governmental function. The focus of the inquiry is the authority *delegated* to the PPC, not the authority it *exercised*. The PPC failed to openly deliberate on the governmental function that the defendant school board had delegated to it. Subsequently, the defendant school board adopted the PPC's recommendation. The defendant school board's adoption of the recommendation effectively foreclosed any involvement by members of the public and essentially meant that the decision made by the PPC at a closed meeting was a fait accompli. *Booth Newspapers*, [444 Mich] at 229. Consequently, the PPC made closed-session deliberations and decisions in violation of the OMA. [*Id*. at 264.]

In this case, the Committee was delegated authority to review the organizations that responded to the request for proposals and make a recommendation to the Board. The Committee screened and presented for consideration three search firm candidates. At the January 11, 2017 open meeting, it recommended Ray as the most qualified search firm and explained the reasons for its recommendation. It was only after this presentation that the Board accepted the Committee's recommendation. Plaintiff offered no evidence to demonstrate that the Board, rather than the Committee, held meetings, made decisions, or deliberated concerning the selection of a search firm outside of the January 11, 2017 open meeting. Moreover, because the

-6-

matter was discussed at an open meeting and the Board took affirmative action on the Committee's recommendation, this is not a situation in which the Board was simply rubber-stamping the Committee's closed-session activities. Accordingly, plaintiff failed to establish a question of material fact that would preclude summary disposition.

The balance of plaintiff's claims alleged OMA violations by the Board arising from the Board's March 16, 2017 decisions to reduce the number of final candidates to three, to refer to the qualifying applicants by number in open session, and its selection of the final candidates, as well as the Board's later selection of Vitti for the superintendent position on April 18, 2017, after having completed a site visit to Vitti's then-current school district. Defendants sought summary disposition as to these counts, arguing that no OMA violations occurred because each of the Board's challenged decisions occurred after the Board discussed and deliberated the matters in open meetings. Defendants acknowledged that the Board met in private sessions on March 16, 2017, but maintained that it did not discuss, deliberate, or narrow the list of candidates in any manner. The trial court agreed with defendants, and granted summary disposition in their favor.

We find no error in the trial court's ruling because defendants presented unrebutted evidence demonstrating that the Board's March 16, 2017 activities did not violate the OMA. Section 8 of the OMA incorporates a number of exceptions to the general requirements concerning open meetings, one of which permits a public body to meet in a closed session "[t]o review and consider the contents of an application for employment or appointment to a public office if the candidate requests that the application remain confidential." MCL 15.268(f). As with other exemptions in the OMA, § 8(f) is to be construed narrowly. *Booth*, 444 Mich at 230; *Schmiedicke*, 228 Mich App at 261. It permits closed sessions only to review personal matters in an application and does not extend to decision-making activities, nor does it permit "reduction decisions under the guise of this exemption." *Booth*, 444 Mich at 230-231.

At the March 16, 2017 meeting, the Board entered a closed session under § 8(f) to review personal information concerning several applicants, including their résumés and a short video clip prepared by Ray. According to Ray, every applicant requested confidentiality. While the Board only reviewed materials from 10 of the 75 applicants, the limited review was the result of Ray's screening, from which Ray determined that only 10 applicants met the Board's qualification requirements. In other words, the Board's review of only a fraction of the applicants was not the product of its own discussion or deliberations. Furthermore, after returning to open session, several Board members questioned Ray about the qualifications used in its screening process, thereby opening that subject to public scrutiny.

Importantly, every Board member who was deposed in this matter unequivocally testified that there were no deliberations or discussions among the Board members regarding the applicants' qualifications during the closed session. Even when the Board members individually ranked the applicants during the closed session, the rankings were completed anonymously and the results were presented by Ray so as to ensure that none of the Board members was aware of other members' opinions. This procedure gave the Board an understanding of each applicant's general standing and served as a starting point for the Board's public deliberations, which avoided private discussions among the Board members. When the Board returned to its open-session meeting, it was then able to consider the merits of the qualifying applicants on the basis of the information it reviewed in closed session. The Board also discussed and voted on the

possibility of considering a candidate who was not on the list of qualified applicants, which negates plaintiff's speculation that the Board had already settled upon three final candidates before returning to the open session.

Similarly, there was no evidence that the Board's decision to reduce the number of final candidates to three was deliberated or predetermined during the closed session. Although the evidence demonstrates that Ray's recommendation to reduce the number of final candidates was made to the Board in the closed session, Lemmons testified that the Board did not immediately take action on the recommendation because it could not do so in a closed session. The open-session minutes indicate that much discussion of the required qualifications took place before the Board voted on a motion to limit the final candidates to three. The motion was ultimately passed by a four-to-three vote, demonstrating that this decision was not a foregone, predetermined decision as plaintiff contends.

Plaintiff also takes issue with the Board's decision to refer to the applicants by number in the open session, rather than identifying the applicants by name, relying on this Court's opinion in *Palladium Publishing Co v River Valley Sch Dist*, 115 Mich App 490; 321 NW2d 705 (1982).[4] In that case, a board of education publically adopted resolutions suspending several students after discussing the matter in closed session. *Id*. at 492. The students were identified by student number, rather than their names. *Id*. This Court held that the Board's minutes had to contain the names of the students involved in the resolutions, adopting the logic outlined in OAG, 1979-1980, No. 5632, p 563 (January 24, 1980). *Id*. at 493.

While plaintiff contends that *Palladium* compels the conclusion that the Board's use of anonymous numbers in lieu of applicant names was improper under the OMA, we disagree. Notably, apart from citing the OMA's general mandate requiring decisions of a public body to be made in an open meeting, MCL 15.263(2), the *Palladium* Court did not discuss or attempt to construe the language of the OMA. *Palladium*, 115 Mich App at 493-494. The exemption permitting a closed-session review of applications for employment or appointment to a public office recognizes that an applicant may have reasons for maintaining the confidentiality of his or her prospective candidacy. For instance, if the applicant's candidacy was publically known from the outset, it could have adverse effects on the applicant's current employment, even when the applicant did not meet minimum qualifications. However, the exemption also states that "except as otherwise provided in this subdivision, all interviews by a public body for employment or appointment to a public office shall be held in an open meeting pursuant to this act." MCL 15.268(f). By requiring interviews to take place in an open meeting, the Legislature clearly envisioned that the identities of the applicants would eventually become known. *Booth*, 444 Mich at 231. Yet nothing in the plain language of the exception suggests that the Legislature intended the identities of the applicants to become public knowledge before the interview stage. Limiting the confidentiality of applicants to the early stages of the selection process gives effect

---

[4] An opinion of this Court issued before November 1, 1990, is not precedentially binding upon this Court, but may be considered for its persuasive value. MCR 7.215(J)(1); *Doe v Dep't of Transp*, 324 Mich App 226; 919 NW2d 670 (2018).

to the dual intent conveyed by MCL 15.268(f) by protecting the identity of the applicant until such time as his or her candidacy has an established likelihood of success, which can be gleaned from the fact that the public body's interest in the applicant has reached the point that interviews are necessary. It also ensures that members of the public know who the frontrunners are and have an opportunity to express their feelings about the individuals being seriously considered for the employment or office at issue.

Further, in *Palladium*, 115 Mich App at 492, the ultimate subject matter of the board of education's decision was the suspension of several students. After formally deciding to suspend those students, the matter was resolved and the board was not required to take any further action. In contrast, the matter at issue in this case was the selection of a superintendent for the newly created DPSCD. Thus, unlike in *Palladium*, the narrowing of the prospective candidates for the superintendent position was by no means the final step in the ultimate decision to be made by the Board. Nor were the Board's deliberations conducted in a closed meeting. Instead, the Board discussed the applicants at an open meeting, but simply kept the identities of the applicants anonymous until the final candidates were selected and notified. The public was still privy to the Board's discussions and stated reasons for favoring certain applicants, enabling the public to scrutinize the Board's decision-making process. Moreover, when the final three candidates were selected, their identities were disclosed to the public the following day.

Plaintiff also argues that the Board's selection of Vitti as the superintendent on April 18, 2017, was predetermined outside of the public meeting, after several members of the Board visited Vitti's then-current school district. Plaintiff argues that the Board's actions violated the OMA's requirement that both decisions and interviews take place at public meetings. See MCL 15.263(2); MCL 15.268(f). Plaintiff's position is again unsupported by the record evidence. During the search for a university president at issue in *Booth*, 444 Mich at 218, groups of regents met with several candidates in their home cities "to discuss the position and the candidates' interests and qualifications." One regent acknowledged that the purpose of the visits was to assess and recruit candidates, and the Supreme Court determined that the "visits" were, in actuality, private interviews that violated MCL 15.268(f). *Id*. at 218, 231.

The facts at issue in this case are distinguishable because the Board members who visited the final candidates' districts were engaged in independent fact-finding, primarily collecting data from sources other than the candidates themselves. The Board toured several schools; talked to constituents, community stakeholders, students, and school personnel; and observed how the final candidates conducted business in their respective districts. Peterson-Mayberry testified that the final candidates were present, but were not interviewed, and Hunter-Harvill indicated that there was no time to ask questions during the site visits. Admittedly, Lemmons described the encounter with Vitti during the site visit as "cordial," and said that Vitti answered questions that were asked of him. However, Lemmons also explained that the purpose of the visit was "to see, in practice, how the superintendent had conducted business and operated his district." In addition, he explicitly referred to the people who were interviewed during the site visit, i.e., "staff, personnel, community, community leaders, the schools, principals and et cetera." Viewed in this context, and coupled with the other Board members' categorical denials that any interviewing occurred, we agree with the trial court's conclusion that Lemmons's brief reference to questions that Vitti answered would not leave reasonable minds in doubt as to whether an interview occurred during the site visit.

Lastly, as with plaintiff's other contentions that the Board's decisions were informally reached in private and simply adopted in an open meeting, plaintiff presents no evidence that the Board's selection of Vitti on April 18, 2017 was a fait accompli. To the contrary, the evidence indicates that the Board openly considered the final candidates' qualifications on April 18, 2017, focusing its discussion on the candidates' interviews, the candidates' "Homework Assignment," the information compiled by Wayne RESA following the site visits, and the results of constituent surveys and questionnaires. Thus, even if some of the Board members correctly anticipated that Vitti would be offered the superintendent position, the evidence demonstrates that his selection was the result of the Board's public deliberation and consideration of the information presented at the April 18, 2017 open meeting.

In sum, the evidence presented by defendants demonstrated that no material question of fact existed concerning the Board's compliance with the OMA and that it was therefore entitled to judgment as a matter of law. Plaintiff offered no evidence to rebut this conclusion, and the trial court did not err by granting defendants' motion for summary disposition.

Affirmed.


/s/ Michael J. Kelly
/s/ Karen M. Fort Hood
/s/ Brock A. Swartzle

-10-